No. 20-16174

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TWITTER, INC.,

PLAINTIFF–APPELLANT,

v.

MERRICK B. GARLAND, in his capacity as Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, CHRISTOPHER WRAY, in his capacity as Director of the Federal Bureau of Investigation, and FEDERAL BUREAU OF INVESTIGATION,

DEFENDANTS–APPELLEES.

On Appeal from the United States District Court
for the District of Northern California, Oakland
4:14-cv-04480-YGR

Yvonne Gonzalez Rogers, District Judge

## BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AND AMERICAN CIVIL LIBERTIES UNION OF SOUTHERN CALIFORNIA, IN SUPPORT OF PLAINTIFF–APPELLANT'S PETITION FOR REHEARING EN BANC

Andrew Crocker
David Greene
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email:  andrew@eff.org
Telephone:  (415) 436-9333

Brett Max Kaufman
Ashley Gorski
Patrick Toomey
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
Telephone: (212) 549-2500
bkaufman@aclu.org

Matthew T. Cagle
ACLU FOUNDATION OF
    NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
mcagle@aclunc.org

Peter J. Eliasberg (SBN 189110)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W 8th Street, Suite 200
Los Angeles, CA 90017
Telephone: (213) 977-9500
peliasberg@aclusocal.org


*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae Electronic Frontier Foundation, American Civil Liberties Union, American Civil Liberties Union of Northern California, and American Civil Liberties Union of Southern California state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: April 28, 2023    By: _/s/ Andrew Crocker_
             Andrew Crocker

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST...................................................................1

INTRODUCTION ...................................................................................2

ARGUMENT ..........................................................................................4

    I.    THE PANEL'S PRIOR RESTRAINT ANALYSIS DEFIES
    PRECEDENT FROM THE SUPREME COURT AND THIS
    COURT, AND IT CONFLICTS WITH THE LAW OF OTHER
    CIRCUITS. ..........................................................................................4

        A.    Prior Restraints Are Uniquely Disfavored Under
        Longstanding First Amendment Precedent...............................4

        B.    The Panel Wrongly Excluded Information "Generated by the
        Government" from Prior Restraint Protections. ........................9

        C.    The Panel Erred in Holding That Freedman's Procedural
        Protections Do Not Apply.........................................................12

    II.    IF LEFT UNDISTURBED, THE PANEL'S DECISION PRESENTS
    AN EXCEPTIONAL THREAT TO FIRST AMENDMENT RIGHTS
    IN THIS CIRCUIT. ..........................................................................15

CONCLUSION .....................................................................................18

CERTIFICATE OF COMPLIANCE.......................................................20

CERTIFICATE OF SERVICE ...............................................................21

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. United States*,
509 U.S. 544 (1993) ................................................................. 2, 15

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .........................................................................6

*Butterworth v. Smith*,
494 U.S. 624 (1990) ......................................................................9

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ....................................................................14

*City of Littleton v. Z.J. Gifts D-4*,
541 U.S. 774 (2004) ....................................................................14

*Columbia Broad. Sys., Inc. v. U.S. Dist. Ct. ("CBS")*,
729 F.2d 1174 (9th Cir. 1984)...............................................7, 12

*Doe v. Mukasey*,
549 F.3d 861 (2d Cir. 2008),.............................................10, 11, 16

*Domingo v. New England Fish Co.*,
727 F.2d 1429 (9th Cir. 1984)......................................................7

*Elrod v. Burns,*
427 U.S. 347 (1976) ....................................................................15

*Freedman v. Maryland*,
380 U.S. 51 (1965). ............................................................. *passim*

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,
860 F.3d 1244 (9th Cir. 2017)......................................................7

*Hague v. CIO*,
307 U.S. 496 (1939) ....................................................................14

*Hunt v. Nat'l Broad. Co.*,
872 F.2d 289 (9th Cir. 1989).........................................................7

*In re NSL*,
33 F.4th 1058 (9th Cir. 2017)) ...........................................3, 8, 11

*Levine v. U.S. Dist. Ct.*,
764 F.2d 590 (9th Cir. 1985)......................................................7, 8

*Near v. Minnesota*,
  283 U.S. 697 (1931)). ................................................................4, 5, 6, 18

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976). ..................................................... *passim*

*New York Times v. United States* (*Pentagon Papers*),
  403 U.S. 713 (1971) ................................................... 7, 12, 15

*Oklahoma Publ'g Co. v. Dist. Ct.*,
  430 U.S. 308 (1977) ................................................................12

*Patterson v. Colorado*,
  205 U.S. 454 (1907) ..................................................................5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
  413 U.S. 376 (1973) ................................................................14

*Procter & Gamble Co. v. Bankers Trust Co.*,
  78 F.3d 219 (6th Cir. 1996) ....................................................10

*Promotions Ltd. v. Conrad*,
  420 U.S. 546 (1975) ..............................................................4, 7

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) ................................................................10

*Shuttlesworth v. City of Birmingham*,
  394 U.S. 147 (1969) ................................................................14

*Smith v. Daily Mail*,
  443 U.S. 97 (1979). ..................................................................7

*Snepp v. United States*,
  444 U.S. 507 (1980) ................................................................11

*Spokane Arcades, Inc. v. Brockett*,
  631 F.2d 135 (9th Cir. 1980) ..................................................13

*State v. Simants*,
  236 N.W.2d 794 (Neb. 1975). ..................................................6

*Twitter, Inc. v. Garland*,
  61 F.4th 686 (9th Cir. 2023). ....................................................3

*Vance v. Universal Amusement Co.*,
  445 U.S. 308 (1980) ......................................................... 12, 13

## Rules

Fed. R. App. P. 35(a)(1)...........................................................................4

Fed. R. App. P. 35(a)(2)...........................................................................4

## STATEMENT OF INTEREST

The Electronic Frontier Foundation ("EFF") is a member-supported, non-profit civil liberties organization with more than 30,000 dues-paying members nationwide, bound together by a strong and mutual interest in helping courts ensure that constitutional rights remain protected as technologies change, digital platforms reach wide adoption, and the Internet reshapes the government's interactions with its citizens. EFF has appeared before federal courts across the country, as counsel and amicus, in cases involving constitutional challenges to government surveillance orders. *In re National Security Letter*, 863 F.3d 1110 (9th Cir. 2017) (counsel); *In re Three National Security Letters*, No. 18-56669 (9th Cir. 2022) (amicus).

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization with approximately two million members and supporters dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU of Northern California and ACLU of Southern California are state affiliates of the national ACLU. The ACLU has appeared before federal courts in numerous cases involving government surveillance orders and First Amendment rights, including as counsel in *In re Certification of Questions of Law to the Foreign Intelligence Surveillance Court of Review*, No. FISCR 18-01, 2018 WL 2709456 (FISCR Mar. 16, 2018), and *John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d Cir. 2008).

Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Pursuant to Circuit Rule 29-2(a), the parties have consented to the filing of this brief.

## INTRODUCTION

This case arises of Twitter's attempt to publish a transparency report describing the aggregate number of government surveillance orders it received during a six-month period in 2013. Twitter submitted its draft transparency report to the FBI for review, and the FBI, in turn, forbade Twitter from publishing it.

In barring Twitter from engaging in speech before that speech occurred, the government imposed a quintessential prior restraint, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quotations and citation omitted, emphasis removed). Unlike the "threat of criminal or civil sanctions after publication," which "chills" speech, prior restraints entirely "freeze" speech for their duration, *Nebraska Press*, 427 U.S. at 559—in this case, more than nine years and counting.

Breaking with bedrock First Amendment precedent from the Supreme Court and prior rulings of this Court and a sister circuit, the panel held that the government's prohibition on Twitter's speech was not entitled to the procedural protections historically accorded prior restraints, set forth in *Freedman v. Maryland*, 380 U.S. 51 (1965). *See Twitter, Inc. v. Garland*, 61 F.4th 686, 707 (9th Cir. 2023).

In holding that *Freedman* does not apply in this case, the panel distorted prior restraint jurisprudence in several respects. First, the opinion created a vast, new category, unsupported by precedent, to which *Freedman* is purportedly inapplicable: "government restrictions on the disclosure of information transmitted confidentially as part of a legitimate government process, because such restrictions do not pose the same dangers to speech rights as do traditional censorship regimes." 61 F.4th at 707. Second, the panel ignored numerous cases applying *Freedman* outside of traditional "censorship and licensing schemes." *Id.* at 705 (quoting *In re NSL*, 33 F.4th 1058, 1066–77 (9th Cir. 2017)). And third, in any event, the government's prepublication restriction on the publication of Twitter's transparency report *was* a licensing scheme that is subject to *Freedman*.

Combined with the panel's refusal to apply the "most exacting" substantive scrutiny applied to prior restraints, these errors undermine at least one hundred years of jurisprudence subjecting prior restraints to unique—and uniquely demanding—First Amendment scrutiny. The petition should be granted so that this Court can fully

consider whether to approve such a drastic rewriting of First Amendment law—one that is counter to precedent from the Supreme Court, this Court, and its sister circuits. *See* Fed. R. App. P. 35(a)(1).

The consequences of the panel's decision are severe and far-reaching. It carves out, for the first time, a whole category of prior restraints that receive no more scrutiny than subsequent punishments for speech—expanding officials' power to gag virtually anyone who interacts with a government agency and wishes to speak publicly about that interaction. These are matters of exceptional importance and public concern that also merit this full Court's en banc review. *See* Fed. R. App. P. 35(a)(2).

## ARGUMENT

I.  **THE PANEL'S PRIOR RESTRAINT ANALYSIS DEFIES PRECEDENT FROM THE SUPREME COURT AND THIS COURT, AND IT CONFLICTS WITH THE LAW OF OTHER CIRCUITS.**

A.  **Prior Restraints Are Uniquely Disfavored Under Longstanding First Amendment Precedent.**

The panel's decision runs counter to what had previously been one of the most uncontroversial and "deeply etched" precepts in First Amendment law: that prior restraints are the "essence of censorship." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975); *Nebraska Press*, 427 U.S. at 557 (quoting *Near v. Minnesota*, 283 U.S. 697, 713 (1931)). Indeed, as the Supreme Court recognized 116 years ago, "the main purpose of [the First Amendment] is to prevent all such Previous restraints

upon publications as had been practiced by other governments." *Nebraska Press*, 427 U.S. at 557 (quoting *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (cleaned up) (distinguishing prior restraints from subsequent punishment of speech).

The Founders debated whether the freedom of speech included *only* prior restraints—as Blackstone had earlier claimed—or whether it included other restrictions on speech as well. "The criticism upon Blackstone's statement has not been because immunity from previous restraint upon publication has not been regarded as deserving of special emphasis, but chiefly because that immunity cannot be deemed to exhaust the conception of the liberty guaranteed by State and Federal Constitutions." *Near*, 283 U.S. at 714–15. And although the First Amendment was ultimately interpreted to also protect against post-publication intrusions on the freedoms of speech and the press, prior restraints remained more strongly disfavored. Unlike the "threat of criminal or civil sanctions after publication," which "chills" speech, prior restraints entirely "freeze" speech for their duration. *Nebraska Press*, 427 U.S. at 559.

For a solid century, the Supreme Court has repeatedly made clear that because prior restraints present such unique dangers, they are permissible only in the rarest cases. In 1931, the Court observed that the use of prior restraints was so far outside our constitutional tradition that "there ha[d] been almost an entire absence of attempts to impose" them—a consistency that reflects "the deep-seated conviction

that such restraints would violate constitutional right[s]." *Near*, 283 U.S. at 718. Thereafter, "the principles enunciated in *Near* were so universally accepted that the precise issue did not come before" the Court for another 40 years. *Nebraska Press*, 427 U.S. at 557–58 (citing *Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971).

Indeed, the Supreme Court's decision in *Nebraska Press* demonstrates just how well-established this principle was. In that case, the Court was asked to determine whether the right to a fair trial could justify a broad prior restraint against pre-trial publicity. 427 U.S. at 541. But the aspect of the trial judge's restrictive order most analogous to the prohibition at issue here—a prohibition on "reporting the exact nature of the restrictive order itself"—was so patently unconstitutional that the Nebraska Supreme Court voided it before the remainder of the publication bar reached the U.S. Supreme Court. *Id*. at 544. *See also State v. Simants*, 236 N.W.2d 794, 799, 805 (Neb. 1975).

The unbroken line of authority that prior restraints are reserved "for exceptional cases," *Near*, 283 U.S. at 716, has created a heavy presumption of unconstitutionality that the government must overcome. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Keefe*, 402 U.S. at 419. Even if publication entails the risk of sanctions, "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand."

*Conrad*, 420 U.S. at 559 This precedent has given rise to special substantive and procedural protections, each unique to prior restraints.

This Court has consistently subjected prior restraints to the "most exacting scrutiny," a standard derived from the Supreme Court's decisions in *New York Times v. United States* (*Pentagon Papers*), 403 U.S. 713, 714 (1971), and *Smith v. Daily Mail*, 443 U.S. 97, 102 (1979). *See Columbia Broad. Sys., Inc. v. U.S. Dist. Ct.* ("*CBS*"), 729 F.2d 1174, 1178 (9th Cir. 1984); *Hunt v. Nat'l Broad. Co.*, 872 F.2d 289, 295 (9th Cir. 1989); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1440 n.9 (9th Cir. 1984); *Levine v. U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985). This scrutiny applies even in cases the government claims implicate its national security interests. *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1259–60 (9th Cir. 2017) (citing *Pentagon Papers*, 403 U.S. at 714).

In addition, those subject to prior restraints are accorded crucial procedural protections, as set forth in *Freedman v. Maryland*, 380 U.S. 51 (1965). The broad purpose of the *Freedman* protections is to promptly ensure exacting judicial oversight to minimize the duration of improperly issued restrictions. *Id.* at 58 ("[O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint"). Under *Freedman*, (1) the burden of justifying the prior restraint always remains with the government; (2) the

government will seek judicial approval of the prior restraint within a specified brief period; (3) any temporary restraint imposed pending the judicial determination shall be only for the purposes of preserving the status quo for the shortest fixed period compatible with sound judicial determination; and (4) the procedure must assure a prompt final judicial determination. *Id.* at 58–59.

The panel decision in this case jeopardized these bedrock protections. As Twitter argues in its petition, the panel's reliance on *In re NSL*, 33 F.4th 1058, 1076 n.21 (9th Cir. 2022), ignores well-established circuit precedent applying the exacting "clear and present danger" standard to prior restraints. Pet. for Reh'g at 16, 18 (quoting *Levine*, 764 F.2d at 595). If *In re NSL* is indeed read to entirely reject the application of "most exacting" prior restraint scrutiny, it would mean that the same scrutiny applies to all content-based restrictions on speech, be they prior restraints or after-the-fact punishments. It also would leave the *Freedman* protections as the *only* special protections shielding those who are subject to prior restraints, as compared to other speech restrictions, an outcome that is entirely inconsistent with First Amendment case law and history.

But the panel decision in this case went one step further and carved out a significant exception to *Freedman*, holding that the procedural protections applied only to speech restrictions that are "closely analogous" to the "film censorship scheme" at issue in *Freedman* itself. 61 F.4th at 707–08. This leaves a vast array of

other prior restraints with no special protection at all in this Circuit, despite the ample Supreme Court authority requiring it.

### B. The Panel Wrongly Excluded Information "Generated by the Government" from Prior Restraint Protections.

*Freedman*'s protections apply to all extrajudicial prior restraints because they are designed to involve the judiciary as quickly as possible, with a "prompt final judicial determination" as the ultimate goal. 380 U.S. at 59. There is no precedential support for the panel's holding that exempts "government restrictions on the disclosure of information transmitted confidentially as part of a legitimate government process" from these requirements. 61 F.4th at 707.

The panel's chief authority for its exception, *Butterworth v. Smith*, 494 U.S. 624 (1990), actually supports the application of *Freedman* to the censorship of Twitter's transparency report. *See* 61 F.4th at 705, 708. In *Butterworth*, the Supreme Court struck down the part of a Florida law that prohibited grand jury witnesses from disclosing their own testimony even after the grand jury was discharged. *See* 494 U.S. at 632. That prohibition is more closely analogous to the speech restriction in this case. Although *Butterworth* left a portion of the statute in place, it did not authorize prior restraints because it concerned punishment *after* publication, and it did not gag speech before it occurred.[1]

---

[1] Statutes that criminalize the publication of certain information are not considered

The panel also erred in relying on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), for the proposition that *Freedman* does not apply here. *See* 61 F.4th at 705. In *Seattle Times*, the Court held that a newspaper had to comply with a protective order (to which it had agreed) prohibiting the disclosure of discovery material. 467 U.S. at 24–27. In declining to apply traditional prior restraint principles, the Court emphasized that the newspaper would have to agree to follow the protective order to obtain the information in the first place, therefore distinguishing it from prior restraint cases in which a speaker is involuntarily gagged. 467 U.S. at 32, 34. *See also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) (recognizing that *Seattle Times* applies narrowly and only to restraints on parties to civil litigation who have gained access to information by agreeing to a protective order as part of the discovery process). This case, of course, does not involve any such agreed-upon restrictions.

The panel opinion also creates a split with the Second Circuit in *Doe v. Mukasey*, 549 F.3d 861, 877 (2d Cir. 2008), which applied *Freedman* and rejected the government's attempts to rely on *Butterworth* and *Seattle Times*. Notably, the censorship determination here did not offer any of the procedural safeguards

---

prior restraints because unlike judicial and executive orders, they are not self-executing. *Landmark,* 435 U.S. at 833, 838 (statute that allowed for punishment after publication not a prior restraint).

contained in the NSL statute considered by the *Mukasey* court, or indeed by this
Court in *In re NSL. See Mukasey*, 549 F.3d at 879; *In re NSL*, 33 F.4th at 1079.

The panel attempted to distinguish *Mukasey* as "fail[ing] to recognize that
*Freedman* has not been extended to long-accepted confidentiality restrictions
concerning government-provided information because of the differences between
these types of confidentiality requirements and traditional prior restraints." 61 F.4th
at 708. But this case does not involve the kinds of "government confidentiality
agreements" that "court have upheld" in the past "without discussing or considering
*Freedman*'s application." *See* 61 F.4th at 707 (citing *Snepp v. United States*, 444
U.S. 507, 509 n.3 (1980)). Cases like *Snepp* involve confidentiality agreements with
people who elected to work for the government and were thus granted access to the
government's classified information. *See Snepp*, 444 U.S. at 509 n.3. Twitter's case
is nothing like those: it is a private company operating a publicly available service,
*forced* into interactions with the government through the government's unilateral
imposition of surveillance demands for data about Twitter's users, and the
government's unilateral classification decisions. *See Mukasey*, 549 F.3d at 877
(rejecting analogy to *Snepp* in case where Internet service provider "had no
interaction with the Government until the Government imposed its nondisclosure
requirement upon it"). What's more, that classification does not merely concern the
who, what, where, and why of the government's demands but extends to the fact that

the government made any demands at all.

The panel is incorrect that both of these types of "government-provided information" are identical for purposes of the First Amendment. 61 F.4th at 708. To conclude that the government's exercise of power to gag a private party is indistinguishable from the imposition of restrictions on information the government provides to its own employees, contracting at arm's length, is a remarkable proposition. And for the government to gag that private party without the protections that have applied to executive prior restraints for more than a century is nothing short of radical.[2]

C.     The Panel Erred in Holding That Freedman's Procedural Protections Do Not Apply.

Contrary to the panel's opinion, 61 F.4th at 707, *Freedman*'s procedural protections apply to government speech bans that are not part of a permitting or licensing scheme. In *Vance v. Universal Amusement Co.*, 445 U.S. 308, 310, 316 (1980), for example, a Texas statute empowered the state to obtain an ex parte

---

[2] Moreover, there are many cases in which courts have applied the special scrutiny due to prior restraints where the ultimate *source* of the information the government seeks to control was the government itself. *See, e.g.*, *Nebraska Press,* 427 U.S. at 543 (press heard confession and other evidence while attending pretrial hearing); *Oklahoma Publ'g Co. v. Dist. Ct.*, 430 U.S. 308, 309 (1977) (reporters obtained juvenile's name by attending court hearing which by law was supposed to be closed); *New York Times*, 403 U.S. at 713 (Pentagon Papers generated by a Defense Department contractor); *CBS*, 729 F.2d at 1176 (temporary restraining order preventing CBS from broadcasting surveillance tapes created by the government).

temporary restraining order lasting as long as 10 days, which could then be converted into a temporary injunction, and ultimately a year-long injunction, against exhibiting films if the distributor had demonstrated a habitual "commercial exhibition of obscenity" in the past. A court ultimately decided whether an injunction was warranted. The scheme in *Vance* was not a permitting scheme, and there was no pre-exhibition review of enjoined films. Indeed, films that were actually enjoined were not reviewed at all. Instead, injunctions were based on past exhibitions. *Vance*, 445 U.S. at 316 & nn.4, 5. Nevertheless, the Supreme Court approved the lower court's finding that the schemes were "procedurally deficient, and that they authorize prior restraints that are more onerous than is permissible under" *Freedman* and its progeny. *Id*. at 317.

Likewise, this Court applied *Freedman* to a speech injunction, as opposed to a pre-exhibition review scheme, in *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135 (9th Cir. 1980). In *Spokane Arcades*, this Court held that preliminary and permanent injunctions authorized by a public nuisance statute were an unconstitutional prior restraint. 631 F.2d at 138. Emphasizing that "'the burden of supporting an injunction against future exhibition is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication,'" this Court found the statute failed to satisfy *Freedman*. *Id.* (quoting *Vance*, 445 U.S. at 315).

Even if *Freedman* were limited to permitting or licensing schemes, which it

is not, the government's actions here impose a de facto licensing scheme. A "licensing scheme" is any regime that forbids individuals from publishing without obtaining government permission in advance. Classic licensing schemes include municipal requirements that the public obtain permits to protest on public streets, *see Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); local ordinances prohibiting public assembly in city parks without government sign-off, *see Hague v. CIO*, 307 U.S. 496, 516 (1939); state laws proscribing the solicitation of money absent an official's say-so, *see Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940); and laws regulating adult entertainment businesses, *see City of Littleton v. Z.J. Gifts D-4*, 541 U.S. 774, 776, 780 (2004).

The government's determination that Twitter could not publish its proposed transparency report fits comfortably into this group. Like other licensing schemes, this prepublication review shared the "special vice" of all prior restraints: it suppressed speech "before an adequate determination that it is unprotected," rather than punishing unprotected speech after it is uttered. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). Agency censors were "empowered to determine whether the applicant should be granted permission—in effect, a license or permit—on the basis of [their] review of the content of the proposed [speech]." *Conrad*, 420 U.S. at 554. And these censors imposed these restrictions without a "prior judicial determination" that their

judgment was correct. *Alexander*, 509 U.S. at 551.

## II. IF LEFT UNDISTURBED, THE PANEL'S DECISION PRESENTS AN EXCEPTIONAL THREAT TO FIRST AMENDMENT RIGHTS IN THIS COURT.

The panel opinion grants the government far-reaching authority to shield its activities from public scrutiny. By creating an exception to *Freedman* for "information transmitted confidentially as part of a legitimate government process," and in holding that *Freedman* applies only to certain kinds of censorship and licensing schemes, the panel opinion enables the government to unilaterally impose prior restraints on speech involving a variety of matters of public concern, while restricting the ability of these gag orders to be meaningfully tested in court. 61 F.4th at 707.

Under the panel's reasoning, the government need only deem a transmission of information "confidential" and its own process "legitimate" to deny the gagged party access to timely judicial review initiated by the government, which often equates to no judicial review at all. This thwarts the very purpose of the *Freedman* procedures—to minimize abridgement of speech caused by even temporary gag orders. Even a meritless gag order that is ultimately voided by a court causes great harm while it is in effect. *See Elrod v. Burns,* 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citing *New York Times*, 403 U.S. at 713)).

Importantly, the *Freedman* procedures do not disable the government from suppressing the dissemination of confidential information when suppression can be justified—but the government must justify it, promptly, to a court.

The panel's new exception to *Freedman* sweeps broadly, and the fact that the restrained information must be "transmitted confidentially" does not meaningfully cabin its reach. Under the prior restraint doctrine, it would be inimical to free speech to allow the government to unilaterally, and without recourse to the courts, gag the recipient of any information the government chooses to transmit merely because the government does so confidentially. Perhaps in some cases, especially involving classified information, the government can carry the day to prohibit a private party's disclosure. But there will be times when information the government provides—or, as here, *creates* through its unilateral imposition upon another—carries such public import that the government will fail to justify its prior restraint. That is precisely what the doctrine is for. Indeed, the legitimacy of that claim of confidentiality is often the very subject of the timely judicial examination required by *Freedman*. *See Mukasey*, 549 F.3d at 881 (NSL statute vested too much deference in executive determination of need for secrecy).

Nor does the panel's novel requirement that the restrained individual learn the information "as part of legitimate government process" limit the scope of the panel's exception. 61 F.4th at 707. Americans learn information from processes the

government considers "legitimate" every day. Incarcerated persons receive information from the government agencies that control virtually every facet of their lives—from living conditions to medical care. Similarly, the exception would seemingly allow suppression of discussion of individuals' interactions with law enforcement, border officials, the Internal Revenue Service, the U.S. Post Office, and the courts. The exception also conceivably applies to state and local governmental processes. Law enforcement would be able to prevent a witness to a crime from telling their family that they were interviewed. A criminal suspect who was beaten by police officers during an otherwise legitimate, confidential interrogation could be more readily gagged from disclosing that interaction. The officers themselves or the officials covering for them therefore gain the benefit of the panel's exemption.

Transparency reporting—the very type of disclosure Twitter wanted to make in this case—is yet another example of speech that the government may more easily gag under the panel's reasoning. The purpose of transparency reporting is to shine much-needed light on government activity, particularly the role that online service providers play in surveillance and content takedowns. Especially following the government declassifications accompanying the Snowden revelations in 2013, the public and the media raised serious questions about the role played by tech companies, and transparency reporting has been a key tool for providers to explain

and clarify how they treat government requests.[3] Indeed, the panel itself "acknowledge[d] Twitter's desire to speak on matters of public concern." *Id.* at 690. This speech, which is essential to public oversight and accountability for government surveillance, lies at the heart of what the First Amendment protects, and there is no basis for subjecting it to lesser constitutional protection.

The panel opinion thus insulates a broad range of potential administrative gag orders from timely judicial review and greatly empowers the government to suppress "publications relating to the malfeasance of public officers," despite "the deep-seated conviction that such restraints would violate" the First Amendment. *Near*, 283 U.S. at 718.

## CONCLUSION

For the reasons above, the Court should grant the petition for rehearing en banc.

Dated: April 28, 2023                    By:  /s/ *Andrew Crocker*
                                                Andrew Crocker

---

[3] *See, e.g.,* Claire Cain Miller, *Tech Companies Concede to Surveillance Program*, N.Y. Times (June 7, 2013), https://www.nytimes.com/2013/06/08/technology/tech-companies-bristling-concede-to-government-surveillance-efforts.html; *Who Has Your Back,* EFF (2014) (detailing which companies published transparency reports), https://www.eff.org/who-has-your-back-2014.

David Greene
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
andrew@eff.org

Brett Max Kaufman
Ashley Gorski
Patrick Toomey
AMERICAN     CIVIL     LIBERTIES
UNION
     FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
Telephone: (212) 549-2500
bkaufman@aclu.org

Matthew T. Cagle
ACLU FOUNDATION OF
     NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
mcagle@aclunc.org

Peter J. Eliasberg (SBN 189110)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W 8th Street, Suite 200
Los Angeles, CA 90017
Telephone: (213) 977-9500
peliasberg@aclusocal.org

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify as follows:

1. This Brief of Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, American Civil Liberties Union of Northern California, and American Civil Liberties Union of Southern California in support of Plaintiff-Appellant's Petition For Rehearing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,196 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated:  April 28, 2023   By:  */s/ Andrew Crocker*
             Andrew Crocker

             *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 28, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  April 28, 2023                   By:  */s/ Andrew Crocker*
                                              Andrew Crocker

                                      *Counsel for Amici Curiae*